**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**SHIRLEY ADAMS,**

**Plaintiff,**

**v.**

**ALTER BARGE LINE, INC.,**                                   **No. 07-501-DRH**

**Defendant.**

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I.   Introduction

Now before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. 35) and Defendant's Motion for Summary Judgment (Doc. 33). Defendant and Plaintiff have filed responses to the respective motions (Docs. 41 & 38). Plaintiff has also filed a motion to strike evidence from the record in Defendant's Motion for Summary Judgment (Doc. 42). Both parties have filed replies to their respective motions (Docs. 39 & 45).

### II.   Factual Background

On January 26, 2000, Plaintiff filed for employment with Defendant and after

receiving a conditional offer of employment was sent for a physical and drug test at St. Clare's Hospital in Alton, Illinois. (Doc. 34, Ex. B; Ex. C at pp. 35-36). Plaintiff signed an authorization allowing St. Clare's Hospital to release all her medical records or other information regarding her treatment to Defendant. (Doc. 34, p. 2, Ex. C at pp. 37-39). Plaintiff asked a hospital employee about the authorization and was told that Defendant would only receive a "fit for duty slip"; after the conversation, Plaintiff signed the authorization slip. (Doc. 41, Ex. 9 at pp. 41-42; Doc. 34, Ex. D).

On February 3, 2000, Plaintiff began working for Defendant as a Crew Dispatch Clerk. As part of her duties, she was in charge of processing documentation of new employees. (Doc. 34, Exs. A, G, & H). She worked with new employees, completing various forms, medical insurance enrollments, and verification that Defendant required of new employees and forwarded those documents to the corporate office. (*Id*.; Ex. C at pp. 92-93, 126, 72).

Approximately six months after her employment, Plaintiff received her first performance review from Bruce Cary, Vice President of Operations (Doc. 34, Ex. C, pp. 94-96). Plaintiff was told that she needed to improve the timeliness of her paperwork. (*Id*.). She also did not receive a pay raise at that time. (*Id*.). Shortly thereafter, Defendant's corporate office began sending correspondence to Plaintiff regarding deficiencies in her processing of new employees. (Doc. 34, Ex. J). On August 30, 2000, nine such problems were documented and on July 20, 2001, eight problems were documented. (Ex. J & K). On October 25, 2001, July 25, 2002,

January 8, 2003, February 17, 2003, and August 28, 2003, Defendant's Human Resources Department sent Plaintiff lists of missing paperwork. (Ex. L -P). One such example of missing paperwork involved Defendant's employee Bobby Nation. (Doc. 34, Ex. A ¶¶ 9-10). Plaintiff failed to obtain a copy of a Prior Drug and Alcohol Verification from Nation's former marine employer, as required by Defendant. (*Id*.). After finally receiving the verification on June 2, 2004, Mary Jekel learned that Plaintiff had made her first request for the verification in May 2004, two years after Nation was hired by Defendant. (*Id*.). Similar paperwork failing were documented in her performance reviews as both her 2001 and 2004 review stated that her paperwork needed to be more accurate and complete. (Doc. 34, Exs. Q & R).

Plaintiff alleges that Defendant kept record of her negative performance in a manner unlike anything it did with other employees. (Doc. 41 at p. 3, Ex. 7 at pp. 13-17). Plaintiff cites one document in her file related to Plaintiff describing an issue that was the fault of three people, including Kim Payne, but no such note was placed in the records related to Payne. (*Id*., Ex. 7 at p. 17; Ex. 13, p. 10). Another note in her file states that "missing paperwork record continues to grow (partly due to Kim P. Following up as well)." However, no note was placed in Payne's file. Plaintiff further alleges that when she received low marks on her 2004 evaluation, Randy Kirschbaum, Defendant's port captain, stated that he was instructed to change his evaluation by Jekel. She further alleges that when she expressed her concern that Jekel was trying to get rid of her, Kirschbaum stated "let's hope not." (Doc. 41, Ex. 1 ¶8). Kirchbaum told her a few weeks later that she had improved 100%. (Doc.

34, Ex. 1 ¶9).  Plaintiff also told Bruce Cary that she feared Jekel was retaliating against her because of Plaintiff's protest regarding her medical records.  (*Id*. at ¶15).  Cary told her that as long as Plaintiff did her job well there wouldn't be a problem.  (Doc. 34, Ex. 10 Dep. Ex. 40).

On August 19, 2004, Plaintiff was terminated by Defendant.  Kirschbaum told Plaintiff that she was being terminated due to performance issues.  (Doc. 41, Ex. 9 at p. 170).  When Plaintiff asked Kirschbaum what performance issues he was referring to, Kirschbaum told her that the Bobby Nation thing did not help.  (*Id*.).  Kirschbaum identified several other areas of Plaintiff's job performance that were inadequate, including the fact that she was disorganized, made incorrect flight and travel arrangements, spent time at work on her personal website, her computer skills were insufficient, and she did not show improvement on her skills.  (Doc. 24, Ex. T at pp. 14-15, 18, 21- 22, 25-31, 40).

Plaintiff challenged her termination by filing a charge of discrimination against Defendant with the Illinois Department of Human Rights (IDHR) in 2004.  (Doc. 34, Ex. U).  Plaintiff charged that she was retaliated against because she opposed four unlawful actions of Defendant; 1) its receipt of her post-offer physical records in 2000, 2) racial discrimination in hiring, 3) sexual harassment involving Jane Lyon and Wayne Williams, and 4) requiring deckhand Tim Scoggins to undergo a return-to-work physical.  (*Id*.; Doc. 34, Exs. X & Y).

As to the charge regarding receipt of her post-offer physical records, Plaintiff alleged that after several weeks of working for Defendant, Wayne Williams,

Port Captain and Plaintiff's supervisor, placed Plaintiff's physical examination report on her desk.  (Doc. 34, Ex. C at p. 43).  Plaintiff believed the disclosure of her medical information to Williams violated the Americans with Disability Act.  (Doc. 41 p. 2, Ex. 1 ¶3; Doc. 34, Ex. W).  Plaintiff subsequently put the report in a file and told Mary Jekel, Defendant's Manager of Human Resources, that she opposed sending it to the corporate office as was requested of her.  (Doc. 34, Ex. C at p. 44).  Plaintiff later sent the report to Jekel.  Jekel testified that Defendant's policy was to keep medical information in a separate file and that the supervisor does not retain the information, although Jekel admitted that the manager initially receives the materials from the clinic and forwards them on to the personnel office.  (Doc. 41, Ex. 11 at pp. 9-10, 85-86).  Jekel also admitted that Kim Payne was copying the medical files and placing them in personnel files, but Jekel warned her of the legal ramifications of such actions and told her to stop copying the files.  (*Id*. at p. 84, Ex. 11, Dep. Ex. 32).

Around the same time, Plaintiff also discovered that Williams was receiving "smut" magazines at the office and viewing pornographic materials on his work computers.  (Doc. 41, Ex. 1 ¶4; Doc. 34, Ex. W).  Plaintiff and Kim Payne complained about the receipt of magazines to Bruce Cary, Vice President of Operations, in February 2009.  (Doc. 41, Ex. 9 at p. 200; Ex. 10 at pp. 12 -15).  Williams received magazines each month in wrapped packages.  (Doc. 41, Ex. 11 at pp. 12-13; Ex. 10 at pp. 12-15).  Both Payne and Plaintiff talked to Cary who wanted to put an end to the act in a professional manner and Payne and Plaintiff decided to

handle the situation themselves by speaking with Williams.  (Doc. 34, Ex. C at p. 201; Doc. 41, Ex. 10 at pp. 12-15).  Cary finally spoke with Williams in November 2000.  (Doc. 41, Ex. 10 at pp. 15-18).

Plaintiff also alleged that she opposed Defendant's policy regarding employment of African Americans in late 2003.  When Plaintiff was hired, she alleges that Williams told her that Defendant did not hire African Americans because if an African American was hired "more would want to come," and instructed Plaintiff to run a blind ad so no African Americans would walk into the office.  (Doc. 41, Ex. 9 at pp. 103 - 104).  Plaintiff stated that she did not review the applications of African Americans "a whole lot because [she] knew that it wasn't going to fly, anyway."  (*Id*. at pp. 104-105).  Despite this, Plaintiff interviewed Franklin Thomas, an African American, and told Kirschbaum, who replaced Williams, that Thomas was a good applicant.  (*Id*. at pp. 104-109).  She told Kirschbaum that "we have a good applicant here...he is black.  We have no other black people here.  Wayne Williams said that I couldn't hire any blacks.  What do you think about this?"  (*Id*. at p. 109).  Kirschbaum told her it was okay with him, but that he would call the corporate office and informed Plaintiff a few days later that corporate's message was to go ahead and hire Thomas.  (*Id*.).    Plaintiff alleges that Kirschbaum called the corporate office only when there were "issues" with applicants.  (Doc. 41, Ex. 12, pp. 50, 52).

In 2004, Plaintiff alleged that she opposed the sexual harassment of cook Jane Lyon, informing Kirschbaum in January that Lyon wanted a transfer due to lewd behavior and pornography on board.  (Doc. 41, Ex. 9 at pp. 190, 199-200;

Ex. 1 ¶12; Doc. 34, Ex. W).  Plaintiff understood that the ship's captain was showing the crew sex videos of himself and his girlfriend.  (Doc. 34, Ex. W).

In July 2004, Kirschbaum told Plaintiff that Jekel did not want Tim Scoggins to return to work because Kirschbaum was concerned about his health after Jekel looked through his medical records.  (Doc. 34, Ex. W; Doc. 41, Ex. 1 ¶6). Scoggins had suffered a personal illness and had been hospitalized in May 2004. (Doc. 34, Ex. A at ¶¶6-7).  Defendant's policy was to require that any person employed who had been off work due to injury or illness take a return-to-work physical exam, including a Job Placement Assessment (JPA) used to evaluate a person's strength and endurance.  (*Id*. at ¶6).  Dr. Halbeck declined to pass Scoggins because of his JPA and requested his physician send records regarding his treatment for liver disease; Scoggins subsequently provided the records and passed his later JPA.  (*Id.* at ¶7).  Plaintiff alleges that Kirschbaum told her that Jekel believed Scoggins should not have been hired in the first place based on a review of his medical records.  (Doc. 41, Ex. 1 ¶6).  Plaintiff questioned Kirschbaum whether a human resources manager could decide whether an employee was fit for work as that decision was up to a doctor.  (*Id.*).  Kirschbaum did not remember speaking with Plaintiff about Jekel not wanting to bring Scoggins back to work.  (Doc. 34, Ex. 12 at pp. 45-47).

On July 10, 2007, Plaintiff filed a three count complaint against Defendant, arguing that Defendant discharged Plaintiff in violation of Title VII of the Civil Rights Act of 1963 and the Americans with Disabilities Act (ADA).  (Doc. 2).

Plaintiff also alleged a claim of retaliatory discharged in violation of the public policy of the State of Illinois.  (Doc. 2 ¶19-23).  Along with the claims raised in her EEOC charge, Plaintiff also alleged, in answers to interrogatories, three other incidents where she opposed the practices of Defendant.  (Doc. 34, Ex. W).  Plaintiff alleged that in early 2003, Plaintiff opposed sexual harassment of a cook, Betty DuBois, which included a sign stating "Cunt" placed where DuBois could see.  (Doc. 41 at p.4; Ex. 9 at pp. 192-93; Doc. 34, Ex. W).  DuBois called Plaintiff hysterical and Plaintiff got her off the boat.  (Doc. 41, Ex. 9 at p. 196).  Kirschbaum acknowledged there was a complaint, but could not recall if it involved sexual harassment.  (Doc. 41, Ex. 12 at pp. 68-69).   Plaintiff further alleged that she complained to Randy Kirschbaum in May 2004 that Dave Smith was showing pornographic tapes of him and his girlfriend and in 2003 she opposed the Defendant's policy in their responsible carrier manual calling for crew members to tell captains what types of prescription drugs they were bringing on board the boat.  (Doc. 34, Ex. W).

        As to her claim that she was retaliated against in violation of Illinois public policy, Plaintiff alleged three instances where she protested safety issues. Plaintiff first alleges that she protested against defendant allowing Eldon Keymon to report to work under the influence of alcohol.  (Doc. 34, Ex. W).  On December, 3, 2003, Plaintiff told Kirschbaum that she smelled alcohol on Keymon's breath when he reported for work and Kirschbaum instructed that Keymon be taken to a medical facility where he failed a reasonable suspicion alcohol test.  (Doc. 34, Ex. Z ¶6). Although Keymon was given an opportunity to participate in a substance abuse

program, he was later fired for not complying with the program requirements. (Id.). Plaintiff admitted that she was not disciplined for her report. (Doc. 34, Ex. C at pp. 207-209).

Plaintiff also contended that she protested unhealthy fumes in the shop building. The shop manger told Plaintiff that another worker was going to call OSHA regarding the heat and fumes in the garage/shop. (Doc. 34, Ex. 1 ¶16). Plaintiff went to the shop and could smell the fumes. (Id.). That same day Kirschbaum told her that a worker was going to call OSHA and she agreed that there were indeed fumes in the shop. (Id.). She later told him that the problem needed to be straightened out because she could not lie under oath when OSHA came. (Id.). Defendant contends that Plaintiff lacks evidence that the fumes were unhealthy in any way. (Doc. 34 p. 18).

Plaintiff's last complaint involved her protest over Nathaniel Overton being allowed on a towboat because she observed him blinking repeatedly and having trouble focusing and other crew members had told her that he didn't seem quite right. Plaintiff also spoke with Kirschbaum regarding a new alarm system. (Doc. 34, Ex. W).

Defendant's answer denied the allegations in the Complaint and stated, as an affirmative defense, that Plaintiff both failed to mitigate her damages and that Plaintiff was discharged because of inadequate and poor job performance. (Doc. 4).

On May 23, 2008, Defendant filed a motion for summary judgment on all counts of Plaintiff's complaint. (Doc. 33). On May 23, 2008, Plaintiff filed a

motion for partial summary judgment on Defendant's affirmative defense regarding mitigation of damages.  (Doc. 35).

### III.  Discussion

**A.      Summary Judgment Standard**

Summary judgment is appropriate under the Federal Rules of Civil Procedure when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986).**  The movant bears the burden of establishing the absence of factual issues and entitlement to judgment as a matter of law. *Wollin v. Gondert***, 192 F.3d 616, 621-22 (7th Cir. 1999).**  The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Schneiker v. Fortis Inc. Co.***, 200 F.3d 1055, 1057 (7th Cir. 2000);** *Baron v. City of Highland Park***, 195 F.3d 333, 337-38 (7th Cir. 1999).**  In response to a motion for summary judgment, the non-movant may not simply rest on the allegations as stated in the pleadings.  Rather, the non-movant must show through specific evidence that an issue of fact remains on matters for which the non-movant bears the burden of proof at trial. *Walker v. Shansky***, 28 F.3d 666, 670-71 (7th Cir. 1994),** *aff'd***, 51 F.3d 276 (citing** *Celotex***, 477 U.S. at 324).**

No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted); *accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994).** "[P]laintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment."  ***Weeks v. Samsung Heavy Industries Co.*, Ltd., 126 F.3d 926, 939 (7th Cir. 1997).**  In other words, summary judgment may not be averted merely by the non-moving party "baldly contesting his adversary's factual allegations," but instead the Plaintiff must come forth with probative evidence to substantiate the allegations of the complaint.  ***Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).**

**B.       Plaintiff's Motion to Strike**

Plaintiff has filed a motion to strike several materials offered as part of Defendant's motion for summary judgment (Doc. 42).  Specifically, Plaintiff moves to strike paragraphs 7 and 10 of Defendant's Exhibit A because the statements are hearsay.  Plaintiff also moves to strike Defendant's Exhibit X and Q, arguing that the documents are both unauthenticated documents containing hearsay in violation of

**FEDERAL RULES OF EVIDENCE 801 and 802**, as well as **FEDERAL RULES OF CIVIL PROCEDURE 56 (e)**.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." **FED. R. EVID. 801.**

1. **Paragraph 7 of Exhibit A**

Plaintiff argues that Paragraph 7 of Exhibit A is inadmissible as hearsay. In Paragraph 7 of Exhibit A, Mary Jeckel states that "Dr. Halbeck requested that Mr. Scoggins provide records from a physician that treated him for liver problems." Plaintiff argues that the statement is offered to assert the fact that Dr. Halbeck made the request. However, Defendant asserts that they are not offering the statement for the truth of the matter asserted, but rather to explain Defendant's conduct in delaying Scoggins return to work until he retook and passed his physical. Defendant further asserts that the statement is offered to explain Jekel's instruction to Plaintiff that Scoggins should obtain the records and deliver them to Dr. Halbeck. The Court agrees with Defendant that the purpose of the statement is to explain Defendant's conduct and instructions to Plaintiff and as such is not being offered for the truth of the matter asserted. Therefore, the Court denies Plaintiff's request to strike Paragraph 7 of Exhibit A.

2. **Paragraph 10 of Exhibit A**

Plaintiff also argues that Defendant's paragraph 10 of Exhibit A

regarding information received by Jekel from Charlotte Rousch, the Human Resources Representative of AEP River Transportation, is inadmissible hearsay. Paragraph 10 of Exhibit A states after receiving a prior drug and alcohol verification for Bobby Nation from AEP River Transportation, Jekel called and spoke with Rousch. Jekel stated that it was at that time that she learned that Plaintiff had first made the request for Nation's verification in May 2004, two years after he was hired. Defendant argues that the statement is not offered to prove that Plaintiff did not make the request for Nation's information, but rather the information is offered to explain their judgement to terminate Plaintiff. Defendant argues that the information demonstrates their belief that Plaintiff did not make the request and to explain its motivation for terminating her employment. Plaintiff agrees that as long as the information is offered to show Jekel's state of mind, then it is admissible for such purposes. Therefore, the Court denies Plaintiff's request to strike paragraph 10.

3.   **Exhibit X**

Plaintiff moves to strike Defendant's Exhibit X based on authenticity and hearsay. Plaintiff argues that Defendant has offered no evidence showing that Exhibit X is an unauthenticated public record under **FEDERAL RULES OF EVIDENCE 901(a) and (b)(7)**. Further, Plaintiff argues that Exhibit X is hearsay because Defendant can not rely on the document alone to prove the absence of an entry in a public record. Under **FEDERAL RULE OF EVIDENCE 901(a)**, a document can be authenticated by "evidence sufficient to support a finding that the matter in question

is what its proponent claims." Further under Rule 901(b)(7) a public record can be authenticated by evidence that the writing is "from the public office where items of this nature are kept." **FED. R. EVID. 901(b)(7)**. Defendant points to other evidence in the record showing that Plaintiff's charge of discrimination was investigated by Carolyn Toney of the Illinois Department of Human Rights (IDHR). (Doc. 34, Ex. Y, E, & F). Further, Plaintiff acknowledged that Ms. Toney conducted a telephone interview with her. (*Id*. at Ex. C at p. 191). Further, Exhibit X is entitled Complainant Interview Notes and cites Carolyn Toney as the investigator who conducted the interview. Here, Defendant has presented evidence that Exhibit X was prepared by an investigator with the IDHR, the administrator agency authorized to investigate Plaintiff's charge. Therefore, Defendant has provided enough evidence to establish that Exhibit X is a document from the IDHR in satisfaction of Rule 901. Further, Exhibit X is admissible under Rule 803(8) as a form of a public agency setting forth the activities of the office. **FED. R. EVID. 803(8)**. Therefore, Exhibit X is admissible.

### 4. Exhibit Q

Plaintiff also argues that Exhibit Q is an authenticated document as well as hearsay. Exhibit Q is an annual performance evaluation of Plaintiff from 2001. Jekel stated that she prepared the document as Manager of Human Resources for Defendant and it was kept by Defendant in the ordinary course of business. Therefore, it is a business record admissible under **FED. R. EVID. 803(6)**.

C.     **Defendant's Motion for Summary Judgment**

1.     **Count I**

Defendant argues that it should be granted summary judgment on Count I because Plaintiff did not raise her allegations about opposition to sexual harassment involving DuBois and Smith at the administrative level, and are therefore waived.  Defendant also argues that Plaintiff's remaining allegations fail to meet both the direct and indirect methods for proving a Title VII claim.

a.     **The EEOC Charge**

Defendant first argues that it should be granted summary judgment on two of Plaintiff's claims of retaliatory discharged under Title VII because she failed to raise those claims in her EEOC charge.  Defendant argues that Plaintiff's claims regarding the sexual harassment of Betty DuBois and Dave Smith are waived because the claims were not raised in her initial EEOC charge.

A plaintiff is not allowed to bring a claim that was not included in her EEOC charge.  ***Cable v. Ivy Tech State College*, 200 F.3d 467, 476 (7th Cir. 1999)**.   The requirement ensures that the EEOC is able to conduct a full investigation; it also provides the employer with notice of the claims as well as gives the employer an opportunity to resolve the matter.  ***Id.* at 476-77 (citing *Harper v. Godfrey Co.*, 45 F.3d 142, 148 (7th Cir. 1995))**.  A claim must fall within the scope of the EEOC complaint and does so "if it is 'like or reasonably related to' the charges in the EEOC complaint and if it 'reasonably could have developed from the EEOC's

investigation of the charge before it.'" *Id.* at 477.  The lawsuit must allege the same conduct and the same individuals as the EEOC complaint.  *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996).  However, the standard is a liberal one and a plaintiff is not required to allege every underlying fact as to each claim. *Jackson v. Local 705, International Brotherhood of Teamsters, AFL-CIU*, No. 95-c-7510, 2002 WL 460841 at *2 (N.D. Ill. March 26, 2002) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985)).

Plaintiff, in her EEOC charge, marked the boxes "Race", "Retaliation", "Sex", and "Disability".[1]  In the charge, she states that she believed her employer discriminated against her by retaliating against her for protesting conduct she believed violated federal law.  She describes an incident regarding her complaints of her supervisor's receipt of pornography and then states that over "the next several years, [she] reported additional incidents of sexual harassment."  Plaintiff contends that this statement is enough to include the complaints regarding DuBois and Smith. However, the plaintiff is required, at a minimum, to describe the same conduct and implicating the individuals in the EEOC charge.  *McKenzie v. Illinois Dept. of Trans.*, 92 F.3d 473, 481 (7th Cir. 1996).  Further, an employee may not complain of certain instances of discrimination to the EEOC and then seek judicial relief for different instances.  *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.

---

[1] The Court notes that Plaintiff's charges of discrimination based on race, sex, and disability were ultimately withdrawn.  (Doc. 34, Ex. Y).

1992) **(finding that general claims of racial harassment were properly dismissed because plaintiff had failed to provide some detail as to the claim)**.  Here, Plaintiff has failed to provide any detail as to her claims involving "additional incidents" and has offered no evidence to suggest that she discussed the incidents involving DuBois and Smith with the EEOC.  Her claims in this action regarding DuBois and Smith do no involve the same conduct and implicate the same individuals as her EEOC complaint.  Therefore, Plaintiff's claims involving DuBois and Smith are dismissed because they were not raised in her EEOC charge.

### b.    Title VII Claims

Defendant argues that Plaintiff has failed to meet her burden under both the direct evidence approach and the indirect evidence approach to Title VII.  Title VII makes it unlawful for an "employer to discriminate against any of his employees...because [the employee] has opposed any practice made an unlawful employment practice." **42 U.S.C. § 2000e-3(a)**.  "An employee can establish a *prima facia* case of retaliation by proceeding under either the direct or indirect method." ***Lewis v. City of Chicago*, 496 F.3d 645, 654-56 (7th Cir. 2007) (quoting *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007))**.  Defendant argues that Plaintiff has failed to meet her burden under both methods.

In order to establish retaliation under the direct method, Plaintiff "must show: 1) [s]he engaged in statutorily protected activity; 2) [s]he suffered an adverse action taken by the employer; and 3) there was a casual connection between the two."

***Brown v. Illinois Dept. Of Nat'l Resources***, **499 F.3d 675, 685 (7th Cir. 2007)**.

Under the indirect method, Plaintiff must present evidence that "1) she engaged in statutorily protected activity; 2) she was performing her job according to [her employer's] legitimate expectations; 3) despite her satisfactory performance, she suffered an adverse employment action; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. ***Luckie v. Ameritech Corp.***, **389 F.3d 708, 714 (7th Cir. 2004) (*citing Williams v. Water Mgmt. Of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004); *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002))**.   Once the *prima facia* case is established, the burden shifts to the employers to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. ***Nichols v. Southern Illinois University-Edwardsville***, **510 F.3d 772, 784-85 (7th Cir. 2007)**.

Plaintiff contends that Defendant fired her in retaliation for opposing racist hiring practices and reporting the sexual harassment of Jane Lyon as well as the receipt of "smut" magazines by her supervisor Wayne Williams.  The first issue is whether Plaintiff engaged in statutorily protected activity.  While an employer is not allowed to discriminate against an employee who opposes a practice made unlawful under Title VII, the employee's complaint must indicate discrimination occurred because of race, sex, national origin, or for some other reason. ***Fischer v. Avande,***

**Inc., 519 F.3d 393, 409 (7ᵗʰ Cir. 2008) (*citing Worth v. Tyer*, 276 F.3d 249,**

**265 (7ᵗʰ Cir. 2001); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7ᵗʰ**

**Cir. 2006)).**  Plaintiff must "genuinely have believed that "she was being harassed

and actually opposed the harassment "by communicating [her] good faith belief to

[the employer]." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7ᵗʰ Cir. 2007).

However, if a plaintiff fails to complain to the employer, there is no claim for

retaliation because an employer cannot retaliate if it is unaware of a complaint.  *Id.*

Failure to notify, in essence, dooms a plaintiff's retaliation claim.  *Id.*  Further,

although a plaintiff must have a reasonable belief that she protested practices

unlawful under Title VII, her claim will be precluded if no reasonable person would

have believed that the conduct violated Title VII.  **See *Fine v. Ryan International**

***Airlines*, 305 F.3d 746, 752 (7ᵗʰ Cir. 2002) ("a groundless claim is one resting**

**on facts that no reasonable person possible could have construed as a case of**

**discrimination").**

Plaintiff alleges she opposed several different matters as discriminatory

under Title VII.  Plaintiff alleges that she opposed sexual harassment of Jane Lyon,

Alter's alleged policy against employing African-Americans, and Wayne Williams'

receipt of smut magazines.  Defendant argues that Plaintiff was not engaging in

statutorily protected activity because she never opposed statements made by

Williams' regarding Defendant's hiring policy towards African Americans and when

Plaintiff inquired into hiring a qualified African American given Defendant's policy

towards African Americans, Kirchbaum, the new port captain, said it was okay and the corporate offices further agreed to hire the candidate.  With respect to the sexual harassment of Jane Lyon, Defendant argues that Plaintiff never voiced her opposition to sexual harassment, but rather conveyed Lyon's request to transfer from the vessel. Further, Defendant argues that there was a substantial time lapse between Plaintiff's protests regarding Williams' receipt of "smut magazines" and her termination which does not constitute a casual connection and Defendant resolved Plaintiff's report and took action to remedy the situation.

A report of discrimination can be a protected activity, but the report must include a complaint of race discrimination or facts sufficient to raise an inference of such discrimination.  ***Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008); *Fischer*, 519 F.3d at 409.**  A plaintiff has to mention discrimination in order for the employer to retaliate. ***Gates v. Caterpiller, Inc.*, 513 F.3d 680, 687 (7th Cir. 2008).**  A mere general complaint of harassment does not create an inference of discrimination, the complaint must indicate a protected class. ***Kodl v. Board of Educ. School Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007).**

Here, it does not appear that Plaintiff ever complained of racial discrimination.  While Plaintiff was told by Wayne Williams, the port captain, at the start of her employment that she could not hire African Americans, she never voiced her opposition or complaint in regards to the hiring practices of Defendant.  (Doc.

41, Ex. 9, pp. 103-106).   Although Plaintiff did state that she didn't look at

applications of African Americans "a whole lot because [she] knew it wasn't going to

fly," Plaintiff never voiced her opposition or reported the discrimination to a

supervisor. *See Andoniassamy*, **547 F.3d at 850-53.**   When Plaintiff did present

potential hiree Franklin Thomas to Randy Kirschbaum, the new port captain, she did

tell Kirschbaum that "we have a good applicant here,...he is black... .  We have no

other black people here.  Wayne Williams said that I couldn't hire any blacks.  What

do you think about this?"  (Doc. 41, Ex. 9, pp. 108-109).   However, Kirschbaum

stated that it was okay with him, although he did state that he would call the

corporate office and a few days later told Plaintiff that corporate said to go ahead and

employ Thomas.  (*Id.*).  It does not appear from the record that Plaintiff ever voiced

her complaint or opposition to Defendant, nor did she present any facts to Defendant

that would infer discrimination.   The record shows that Plaintiff was not engaging

in statutorily protected activity.

Although Plaintiff has not presented any arguments supporting her

claim of opposition to the receipt of "smut" magazines by Williams, her claim also

fails under the direct method.  While she did voice her opinion with regards to the

receipt of the magazines and the fact that Williams viewed porn on his computer, it

is unreasonable to believe that William's mere receipt of pornography and viewing

pornography on his office computer constituted a violation of Title VII. *See Clark*

*County School District v. Breeden*, **532 U.S. 268, 271 (2001) (claim precluded**

**when no reasonable person could have believed the conduct complained of violated the law);** *See also Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2007) **(manager's watching pornography on office computer not offensive enough under Title VII and almost as attenuated as discovering that manager watches pornography on home computer).[2]** In *Yuknis*, the Court noted it was not any of Plaintiff's business whether the manager viewed pornography on his office computer and the Court distinguished the incident from cases where pornography was displayed prominently in the office or emailed to plaintiff.  Nothing in the record here suggests that Plaintiff was exposed to the "smut" magazines and Jekel testified that the magazines came in covers.

Plaintiff makes a somewhat stronger argument in regards to her report of sexual harassment of Jane Lyon.  Plaintiff claims that Jane Lyon called from the towboat telling Plaintiff that she was being exposed to pornography and lewd behavior.[3]  Such activities might constitute a Title VII violation.  **See *Coolidge v. Consolidated City of Indianapolis*, 505 F.3d 731, 734 (7th Cir. 2007) (finding that displaying pornographic videos in a crime lab was not as shocking as a display might be in other situations);** *Fairbrother v. Morrison*, 412 F.3d 39, 40-

---

[2]  The Court notes that even if Plaintiff's report that Williams received "smut magazines" constituted a statutorily protected activity, the event occurred several years before Plaintiff was terminated by Defendants.  **See *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390 (7th Cir. 1999)**.  Further, the record indicates that Defendant spoke with Williams about his receipt of magazines at the office and William's receipt of magazines eventually stopped (Doc. 34; Exhibit C, p. 203; Doc. 41, Ex. 10 at pp. 12-18).

[3]  Plaintiff states that she understood the boat captain was showing a video to his crew involving his sexual encounters with his girlfriend.

**41 (2nd Cir. 2005) (pervasive presence of porn in bathroom and office contributed to hostile work environment).**   However, Plaintiff must have communicated that harassment to Defendant.  **See *Bernier,* 495 F.3d at 375-76 (cryptic instant message not enough, plaintiff must actually oppose harassment by communicating his good faith belief); *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (vague complaints concerning matters other than harassment not enough to constitute protected expression; defendant can not retaliate when there has been no expression).**   Here, the record clearly shows that Plaintiff was merely passing along Lyon's request and reasoning for being removed from the boat, rather than reporting an incident of sexual harassment.

Even if Plaintiff's activities constituted statutorily protected activity, Plaintiff has failed to establish a casual connection between the protected activity and her termination by Defendant.   Plaintiff can rely on either direct or circumstantial evidence to show that the protected activity motivated her employer's actions. Plaintiff has not presented any direct evidence and her circumstantial evidence is lacking.   Circumstantial evidence "allows the trier of fact to infer intentional discrimination by the decision maker, typically through a longer chain of inferences." ***Caskey v. Colgate-Palmolive Company*, 535 F.3d 585, 593 (7th Cir. 2008) (internal citation omitted).**   Circumstantial evidence can be presented through 1) suspicious timing, ambiguous statements, behavior towards other employees and so on; 2) evidence that similarly situated employees were treated differently; or 3)

evidence that the employee was qualified for promotion and passed over and the decision was pretext for discrimination. ***Volvsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689-90 (7th Cir. 2003)**. Suspicious timing alone is not enough. ***Kodl*, 490 F.3d at 562-63.** A casual link can be established by showing that the protected conduct was a motivating factor in an employer's decision. ***Gates*, 513 F.3d at 686.**

Here, the events Plaintiff cites occurred several months or years before Plaintiff was terminated. The receipt of pornographic materials occurred shortly after Plaintiff was hired in 2000 and almost four years before Plaintiff was terminated Further, Williams was no longer employed by Defendant at the time Plaintiff was fired. Plaintiff also admits that she reported the harassment of Lyon to Defendant sometime in early 2004 and Plaintiff was terminated on August 19, 2004, almost eight months after her report of harassment. This large amount of time between the report and termination is insufficient to establish causation. **See *Filipovic*, 176 F.3d 390 (four month time lapse too tenuous); *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (insufficient time sequence when last complaint occurred in August 1996 and plaintiff laid off in November 1996)**. Plaintiff also alleges that her file was "paper" with negative performance information, but the record shows that Plaintiff suffered from a poor job performance from the beginning of her employment.

Further, the Court also notes, that Defendant set forth legitimate,

nondiscriminatory motives for its actions.  Defendant told Plaintiff that she was being terminated for performance reasons, citing an incident involving new hire Bobby Nation.  Plaintiff failed to ask for a Prior Drug and Alcohol Verification from the former employer of Nation for nearly two years after Nation was hired.  (Doc. 34, Ex. A ¶9-10).  Plaintiff admits that the incident with Nation was one of the reasons given for her termination.  (Doc. 34, Ex. C., pp. 170-71).  Defendant found out about the failure to request documents in June 2004, two months before Plaintiff was terminated. (Doc. 34, Ex. A ¶ 9-10). Further, Defendant notes that it had continuing problems with the timeliness of Plaintiff's paperwork.  (Doc. 34, Ex. C, pp. 94-95; Ex. J; Ex. K; Exs. L-P).  The corporate office noted several problems with incomplete documentation of new hires.  (Doc. 34, Exs. J-P).  Written performance reviews substantiate that Plaintiff had an issue with the accuracy and completeness of paperwork.  Her 2001 review stated that "[a]ccuracy and attention to detail is a problem and needs improvement."  (Doc. 34, Ex. Q).  Similarly, her 2004 review showed problems with paperwork and completing new hire packets.  (Doc, 34, Ex. R).  Defendant's decision to terminate Plaintiff seems motivated by her continuing failure in her duties.  Plaintiff, therefore, fails under the direct method.

Under the indirect method of proof, Plaintiff also fails to establish a Title VII retaliation claim in order to survive summary judgment.  Plaintiff continually failed to meet her employer's expectations as demonstrated by her self-acknolwedged poor reviews. (Doc. 34, Ex. C at pp. 162, 164).  Moreover, she has failed to present a similarly situated employee that was treated more favorably.  A similarly situated

employee "need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of him.'"  ***Caskey,*** **535 F.3d at 592 (quoting Gates, 513 F.3d 690).**  Although Plaintiff does mention Kim Payne, a Crew Coordinator in charge of handling payroll and employee benefits issues, Payne received higher marks than Plaintiff in her evaluations, particularly in areas related to quality of work and job performance.  (Doc. 41, Ex. 6 at pp. 10-14).  Therefore, Plaintiff can not show that Defendant retaliated against her for exercising her statutorily protected rights under Title VII.

### 2.    Count II

Defendant further argues that it should be granted summary judgment on Count II of Plaintiff's complaint regarding retaliation under the ADA because Plaintiff failed to raise her claim regarding Defendant's policy requiring its crew members to disclose what prescription medicine they were prescribed before boarding tow boats in her EEOC charge.  Further, Defendant argues that Plaintiff fails on her remaining two claims because she can not meet her burden under the direct or indirect method.

### a.    The EEOC Charge

Defendant first argues that Plaintiff's claim regarding Defendant's policy requiring the disclosure of prescription drug information is waived because she

never alleged it is her EEOC charge.  In her EEOC charge, Plaintiff stated that she "complained about [Defendant's] failure to properly protect the confidentiality of employee's private medical records."  (Doc. 34, Ex. U).  While Plaintiff alleged a failure to protect the confidentiality of medical records, she alleged nothing as to Defendant's policy requiring crew members to disclose their prescription drug information before boarding Defendant's towboats.   The disclosure of drug information could not be expected to grow out of Plaintiff's claim regarding medical confidentiality as the claim involves entirely different conduct and different people. *Cheek*, **97 F.3d at 202-03.**   Therefore, Plaintiff's claim regarding Defendant's prescription drug policy is dismissed because it was not raised in her EEOC charge.

### b.   ADA Claims

The ADA anti-retaliation provision provides that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

**42 U.S.C. § 12203(a).**

Similar to retaliation claims under Title VII, a plaintiff can prove her retaliation claim under the ADA by either the direct or indirect method.  Under the direct method, a plaintiff must present evidence of: "1) statutorily protected activity 2) an adverse action; and 3) a causal connection between the two."   *Squibb v. Memorial Medical Center*, **497 F.3d 775, 786 (7th Cir. 2007) (internal**

quotations omitted) (citing *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006).  Under the indirect method of proof, a plaintiff must show "1) that she engaged in protected activity; 2) that she was subject to an adverse employment action; 3) that she was performing her job satisfactorily; and 4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action."  *Id.* at 788 (quoting *Burks*, 464 F.3d at 759).

Plaintiff alleges that she engaged in a statutorily protected activity when she opposed Defendant's use of her medical records, specifically by Wayne Williams and Mary Jekel.  Plaintiff also opposed conduct towards Tim Scoggins, specifically that she believed that Jekel learned information regarding Scoggins by looking through his medical files.  With regards to post-offer medical examinations, an employer is allowed to require such an exam as long as the information obtained regarding medical conditions or history of the applicants are maintained in separate forms and in separate medical files.  42 U.S.C. § 12112(d)(3).  While an employer is not allowed to disclose the medical records, medical information may be shared with individuals involved in the  hiring process.  *O'Neal v. City ov New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002).  Jekel did testify that Kim Payne copied some physicals and placed them in their employment file, although she stated that she explained the legal ramifications to Payne and told her to stop.  As to the incident involving Scoggins, Plaintiff has not presented evidence that she voiced her complaint to Defendant.  An employer can not be deemed to have retaliated against an employee

if there was no expression or complaint from the employee. *Durkin*, **341 F.3d at 615**. Although Plaintiff stated that she believed the use of medical records in Scoggins' case violated the ADA, nothing in facts suggests that she voiced that complaint to Defendant. (Doc. 41, Ex. 1 ¶ 6). While she did question whether a human resources manager could make a decision regarding whether an employee was fit for duty, she never told Defendant that she opposed Defendant's reviewing of Scoggins' medical records. (*Id*.). Further, Defendant's requirement that Scoggins pass a return to work exam is lawful and not in violation of the ADA. **See *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243 (4ᵗʰ Cir. 1997) (fitness for duty exam did not violate the ADA)**.

Further, Plaintiff fails to establish a casual connection between either event and her termination. Plaintiff's post-offer physical occurred four years before her termination. Further, she has offered only tenuous circumstantial evidence, as discussed earlier, which does not connect the events to her termination.

Plaintiff also fails under the indirect method. She did not meet the legitimate job expectations of Defendant, having conceded that she did not complete hiring packs on time and that her performance evaluations were low. Further, Plaintiff has not been able to demonstrate that she was treated less favorably than a similarly situated employee. Therefore, Defendant is entitled to summary judgment on Count II.

**3.** **Count III**

Defendant further alleges that it is entitled to summary judgment on Count III of Plaintiff's complaint because plaintiff has failed to allege a claim of retaliatory discharge under Illinois common law.  To prove a claim of retaliatory discharge, a plaintiff must prove that: "1) an employee has been discharged; 2) in retaliation for the employee's activities; and 3) that discharge violates a clear mandate of public policy." ***Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000)**.

Plaintiff raises three claims for her retaliatory discharge, arguing that she was retaliated against for reporting that Eldon Keymon came to work under the influence of alcohol, for reporting fumes in Defendant's office, and for opposing the employment of Nathaniel Overton as a towboat pilot.  Defendant argues that Plaintiff failed to sufficiently plead that her discharge violated a clearly mandated public policy.

While there is no specific definition for what constitutes "clearly mandated public policy," retaliatory discharge actions are generally allowed in two settings: when an employee is discharged for filing or anticipating to file a claim under the Workers' Compensation Act, and when an employee is discharged for reporting illegal or improper conduct, otherwise known as whistleblowing. ***Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376, 706 N.E.2d 491, 493**

(1998); ***Sherman v. Kraft General Foods***, 272 Ill.App.3d 833, 838, 651 N.E.2d 708, 711 (4th Dist. 1995). The Illinois Supreme Court has recognized retaliatory discharge where the subject matter "strike[s] at the heart of a citizen's social rights, duties and responsibilities." ***Gomez v. The Finishing Company, Inc.***, 369 Ill.App.3d 711, 719, 861 N.E.2d 189, 197 (1st Dist. 2006) (citing ***Palmateer v. International Harvester Co.***, 85 Ill.2d 124, 130 (1981)). Such duties are found in the State's constitution, statute, and judicial opinions, as well as federal laws. ***McKay v. Pinkerton's Inc.***, 239 Ill.App.3d 509, 512, 607 N.E.2d 237, 239 (3rd Dist. 1992). Under the 1970 Illinois Constitution, "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." ***Palmateer***, 85 Ill.2d at 132.

Plaintiff alleges that her complaints regarding heat and fumes are a matter of public policy because it implicates OSHA. OSHA states that "No person shall discharge or in any many discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under" OSHA. **29 U.S.C. § 660(c)(1)**. Plaintiff's actions might have been a clear mandate of public policy when she told Defendant about heat and fumes in the garage/shop. **See *Sherman*, 272 Ill.App.3d at 839-40 (plaintiff discharged in violation of clear public mandate in reporting asbestos hazards); See also *Gomez*, 369 Ill.App.3d at 719 (preventing the discharge of an employee who reports occupational hazards furthers public policy of protecting lives and**

**property of Illinois citizens).**  Although Plaintiff can not prove the fumes were dangerous, Plaintiff does not need to show that the fumes were actually dangerous. **Bourbon, 223 F.3d at 472 (fact that plaintiff may have been wrong about whether conduct is [improper] is irrelevant).**  Regarding Plaintiff's report of her concerns regarding Overton's presence on a towboat, a clearly mandated public policy can be found under the Illinois Constitution which protects citizens from dangerous activities.  **See Sherman, 272 Ill.App.3d at 838**.  It is possible that protecting citizens from a towboat captain who might pose a safety risk could constitute a clearly mandated public policy.

Although Plaintiff actions might constitute a clear mandate of public policy, she can not establish that her discharge was in retaliation for her activities. The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging Plaintiff. **Bourvon, 223 F.3d at 473**.  As already noted by the Court, Defendant has presented legitimate reasons for firing Plaintiff, citing continuing performance problems.  Further, Plaintiff has offered no response regarding her claim involving Eldon Keymon, and, as Defendant points out, Plaintiff contends that she was not discplined for her report that Keymon was intoxicated. As for claims regarding fumes and her concerns over Nathaniel Overton, Plaintiff has failed to offer evidence showing that Defendant's decision was pretextual as temporal proximity alone is not enough to prove pretext.  Thus, Plaintiff's claim of retaliatory discharge under Illinois common law also fails and Defendant is **GRANTED**

summary judgment on Count III.

**D.**    **Plaintiff's Motion for Partial Summary Judgment**

Plaintiff has moved for partial summary judgment on Defendant's affirmative defense that Plaintiff has failed to mitigate her damages.  In light of the Court granting Defendant's motion for summary judgment on all three counts of Plaintiff's complaint, the Court finds **MOOT** Plaintiff's motion for partial summary judgment.

### IV.   Conclusion

Accordingly, the Court **GRANTS** Defendant's summary judgment (Doc. 33) on all three counts of Plaintiff's complaint.  Further, the Court **DENIES** Plaintiff's motion to strike exhibits (Doc. 42) and **FINDS MOOT** Plaintiff's motion for partial summary judgment (Doc.35).  The Clerk to enter judgment accordingly.

**IT IS SO ORDERED.**

Signed this 26th day of March, 2009.

/s/      *David R Herndon*

**Chief Judge**
**United States District Court**